# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CHINYERE Q. AYIBA, and NELSON ILODIGWE SULEMAN, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-10-5017 |
| WELLS FARGO BANK, N.A. a/k/a, WACHOVIA MORTGAGE, A Division of WELLS FARGO BANK, N.A. and f/k/a WACHOVIA MORTGAGE, FSB, | § § § § § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is a Motion to Dismiss (Doc. No. 23) filed by Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), and a request for a preliminary injunction (Doc. No. 28) filed by Plaintiffs Chinyere Q. Ayiba and Nelson Ilodigwe Suleman ("Plaintiffs"). At a motion hearing on October 21, 2011, the Court determined that, because of inconsistencies in Plaintiffs' written submissions, an evidentiary hearing would be necessary to fully comprehend the nature of Plaintiffs' claims. The Court held an evidentiary hearing on November 1, 2011, at which both parties introduced exhibits and evidence going beyond the pleadings. Rule 12(d) of the Federal Rules of Civil Procedure directs that, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P.

12(d). After notifying both parties and giving a reasonable opportunity for them to present pertinent material (Doc. No. 39), the Court now treats Defendant's Motion to Dismiss as a motion for summary judgment under Federal Rule of Civil Procedure 56.

Having considered the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendant's motion for summary judgment (Doc. No. 23) must be granted in part and denied in part. Plaintiffs' request for a preliminary injunction (Doc. No. 28) also must be granted in part and denied in part, unless the Court receives further briefing from Defendant in ten (10) days that convinces it to proceed otherwise.

## I.    BACKGROUND

This case relates to Defendant Wells Fargo's allegedly wrongful foreclosure on Plaintiffs' home.  Plaintiffs signed a Promissory Note (the "Note") and Deed of Trust with World Savings Bank in 1998.[1] (Doc. No. 40.) World Savings Bank thereafter merged with Wachovia, which then became Wells Fargo.[2] After failing to make timely payments on their loan, Plaintiffs received notice that they were in default (the specifics of what notice Plaintiffs actually received is in dispute, as discussed below). On December 7, 2010, Defendant conducted a foreclosure sale at which it sold Plaintiffs' home at auction. Defendant purchased the property for $49,985.22. (Doc. No. 28, "Pl.

---

[1] As discussed below, Ms. Ayiba and Mr. Suleman testified at the evidentiary hearing that they never actually signed a Deed of Trust. (Tr. 5; Tr. 43.) However, as the Court ultimately disregards that testimony for reasons discussed below, the Court accepts Plaintiffs' contention in their Second Amended Complaint that they signed these documents. (Doc. No. 28 ¶ 6.2.)

[2] Defendant has orally represented to the Court, and Plaintiff has not contested, that these two companies merged. Moreover, a number of other federal courts have taken judicial notice of the fact that Wachovia merged with Wells Fargo Bank in 2009. *See Parmer v. Wachovia*, 2011 WL 1807218, at *1 (N.D. Cal. Apr. 22, 2011) (judicially noticed documents demonstrated that World Savings was succeeded by Wachovia, which then merged into Wells Fargo); *Appling v. Wachovia Mortg., FSB*, 745 F. Supp. 2d 961, 971 (N.D. Cal. 2010) (documents showed World Savings changed its name to Wachovia, which was now a division of Wells Fargo).

Compl." ¶¶ 14, 16.) Defendant has not yet sold the property to a third party, and Plaintiffs continue to reside there. At a hearing on October 21, 2011, the Court granted Defendant's motion for adequate protection, requiring Plaintiff to make payments to Defendant rather than continue to live rent-free in the home. (Min. Entry Oct. 21, 2011.)

In their Second Amended Complaint (the "Complaint"), Plaintiffs assert claims against Wells Fargo for wrongful foreclosure, breach of contract, violations of the Texas Debt Collection Practices Act ("TDCPA"), and violations of the Uniform Commercial Code ("UCC"). (Doc. No. 28, "Pl. Compl.") Plaintiffs also seek a declaratory judgment and assert a quiet title action. (*Id.*) The factual assertions underlying all of Plaintiffs' claims are as follows: (1) Plaintiffs did not receive adequate notice prior to Defendant's foreclosure on their home; (2) prior to foreclosure, Defendant wrongfully refused to accept Plaintiffs' attempts to pay what was due on the loan; and (3) Plaintiffs never signed a Deed of Trust.

With regard to Plaintiff's first assertion, that they did not receive adequate notice prior to foreclosure, there are four types of notice at issue: notice of intent to accelerate, notice of acceleration, notice of default, and notice of sale.[3] Plaintiffs' supplementary briefing—requested by the Court to clarify inconsistencies in Plaintiffs' prior submissions—states that Plaintiffs dispute their receipt of notices of acceleration, default, and sale. (Doc. No. 24, at 3.) Plaintiffs admit in their Complaint and supplementary briefing that Defendant sent them a notice of intent to accelerate on October 15, 2010. (Pl. Compl. ¶ 5.1; Doc. No 24, at 3.) While Plaintiffs admit in their written submissions to having received notice of intent to accelerate, Ms. Ayiba testified at the evidentiary

---

[3] The parties have used different terms to refer to "notice of sale," calling it both as "notice of foreclosure" and "notice of substitute trustee sale." For consistency and clarity, the Court will refer to this document as "notice of sale," the term used in the Texas Property Code. *See* Tex. Prop. Code § 51.002(b).

hearing that she never received such notice. When defense counsel inquired about the notice of intent to accelerate produced by her own lawyer, Ms. Ayiba denied having received the document. (Tr.13-14.)[4]. Ms. Ayiba was not able to respond to defense counsel's inquiry about how or why her attorney obtained or produced a document that she claims Plaintiffs never received. (*Id.*)

As to notice of default, Plaintiffs allege in their Complaint that "[t]here was no notice of default letter prior to the notice of intent to accelerate." (Pl. Compl. ¶ 5.2.) Plaintiffs have asserted, both in their written submissions and in their testimony, that they never received a notice of acceleration. (Doc. No. 24, at 3; Tr. 17.) As to the notice of sale, Plaintiffs state that they received such notice on December 3, 2010, but that they received it online, "through another source not Defendant." (Pl. Compl. ¶ 5.3.)

The date on which Plaintiffs admit to having received notice of intent to accelerate conflicts with the date listed on copy of that document produced by Plaintiffs. Plaintiffs' counsel produced a copy a document titled "Notice of Intent to Foreclose" ("Plaintiffs' Exhibit 1"), which represents Defendant's notice of default and intent to accelerate. Though Plaintiffs' Complaint states that this document was sent on October 15, 2010, the document produced by Plaintiffs is dated September 7, 2010. (*Id.*) Curiously, the October 15, 2010 date on which Plaintiffs claim to have received notice of intent to accelerate corresponds with the date on which Defendant claims to have sent notice of acceleration and notice of sale, two of the documents which Plaintiffs claim never to have received (copies of these documents, dated October 15, 2010, were produced by Defendant as Defendant's Exhibits A and B).

---

[4] The parties have not requested, and the court reporter has not yet finalized, a final, edited version of the transcript from the evidentiary hearing on November 1. The Court therefore cites to the draft version, which is attached to this Memorandum and Order.

In addition to their allegations that they received insufficient notice, Plaintiffs also allege that they tried to make the necessary payments to Defendant prior to foreclosure, but that Defendant rejected their attempts to pay. The specific facts surrounding Plaintiffs' attempts to pay, and Defendant's alleged refusal to accept payment, are inconsistent. In their Complaint, Plaintiffs allege that, prior to the foreclosure, Ms. Ayiba was out of the country and authorized her husband, Mr. Suleman, to make the mortgage payments. (Pl. Compl. ¶ 5.3.) Though Mr. Suleman allegedly attempted to make the payments on at least two occasions, Plaintiffs' Complaint states that he was rejected both times. In one of his attempts, Wachovia apparently refused to accept payment because Mr. Suleman's name was not on the lien note. (*Id.* ¶ 5.3.) When Mr. Suleman again attempted to pay the total reinstatement amount, "Wachovia Mortgage declined the offer and insisted that all payments must be made by Ms. Ayiba." (*Id.* ¶ 5.4.) According to Plaintiffs' Complaint, when Ms. Ayiba returned from vacation, she offered to pay the reinstatement in the amount of $5,000, which Defendant refused to accept, stating that "the property has been scheduled for foreclosure and that the loan was no longer in its custody, but in the custody of its attorneys." (*Id.* ¶ 5.5.)

Plaintiffs' in-court testimony regarding their attempts to pay conflicted somewhat with the facts alleged in their Complaint. Mr. Suleman testified that he made several attempts to call Wachovia and pay the mortgage over the phone. According to Mr. Suleman, when he attempted to pay over the phone, we was told to call back or put on hold for two or three hours. (Tr. 46.) Then, according to his in-court testimony, Mr. Suleman[5] went to a branch where the manager refused to accept payment and gave Mr.

---

[5] During this part of his testimony Mr. Suleman used the pronoun "we," suggesting that he was describing an attempt to make in-person payments at the bank *with* Ms. Ayiba.

Suleman the head office number, telling him to "keep calling them." (*Id.*). At no point

during his testimony did Mr. Suleman mention the factual crux of this portion of

Plaintiffs' Complaint—the alleged statements by Defendant that it would accept payment

only from Ms. Ayiba. Similarly, when Ms. Ayiba testified, she did not mention being out

of the country or asking Plaintiff Suleman to make payments on the mortgage. Rather,

she explained that she went to Wachovia to make payments, but that they refused to

accept payment and told her she had to call Wachovia instead. Ms. Ayiba did not repeat

the allegations in Plaintiffs' Complaint that she was told she could not pay the loan

because it was in the custody of attorneys. Ms. Ayiba also stated that she was attempting

to pay $3,500 (not $5,000, as asserted in the Complaint). (Tr. 32.)

Finally, Plaintiffs testified at the evidentiary hearing that they never signed a

Deed of Trust. (Tr. 5; Tr. 43.) Plaintiffs' counsel introduced as evidence Plaintiffs'

signatures on the Deed of Trust, and compared the signatures to those on their drivers'

licenses in an attempt to prove that the signatures did not match. (Pl. Exs. 2, 3.)

## II.    MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

A court must grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must "inform[] the

Court of the basis of its motion," and identify the portions of the record "which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-

moving party must go beyond the pleadings and identify facts in the record which demonstrate the absence of a genuine issue for trial. *Id.* at 324.

### B.  Analysis

#### 1.  Wrongful Foreclosure

Plaintiffs assert a claim for wrongful foreclosure, and ask the Court to set aside the foreclosure sale. The elements of a wrongful foreclosure claim are: a defect in the foreclosure sale proceedings, a grossly inadequate selling price, and a causal connection between the defect and the grossly inadequate selling price. *Charter Nat'l Bank-Houston v. Stevens*, 781 S.W.2d 368, 371 (Tex. App.—Houston [14th Dist.] 1989, writ denied).

#### a.  Defect in the Foreclosure Proceedings

As to the first element, a defect in the sale proceedings, Plaintiffs contend that the foreclosure sale was defective because they did not receive a notice of default from Wells Fargo prior to the notices of acceleration and foreclosure. They also argue that Wells Fargo was not the holder of the Note or the Deed of Trust, and that it therefore did not have standing to foreclose.

#### i.  Failure to Provide Notice

To lawfully foreclose on property, a mortgagee or trustee is required to comply with the notice requirements set forth in the deed of trust and prescribed by law. *Univ. Savings, Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982). It is undisputed that Plaintiffs were entitled to four types of notice prior to foreclosure: (1) a notice of default; (2) a notice of intent to accelerate; (3) a notice of acceleration; and (4) a notice of sale. In Plaintiffs' supplemental briefing, submitted at the Court's request, Plaintiffs indicate that they are challenging their receipt of the notice of default, the

notice of acceleration, and the notice of sale. (Doc. No. 24.) However, because Ms. Ayiba's testimony at the evidentiary hearing also raised concerns as to the notice of intent to accelerate, the Court will consider all four required notices.

### (a)  Notice of Default

The Texas Property Code requires a lender to provide notice of default. Tex. Prop. Code § 51.002(d). While Plaintiffs' Complaint alleges that they did not receive notice of default (Pl. Compl. ¶ 5.2), both Plaintiffs testified at the evidentiary hearing that they did receive such notice. Ms. Ayiba stated, "the [notice] I received is notice of default," and again, in response to defense counsel's question about what type of notice Plaintiff received, she again said "notice of default[]." (Tr. 13.) Mr. Suleman also testified that the Plaintiffs received notice of default. (Tr. 70.). More importantly, the evidence produced by Plaintiffs in this case plainly demonstrates that the document titled "Notice of Intent to Foreclose," sent by Defendant on September 7, 2010, provides sufficient notice of default. The letter informs Plaintiffs that the loan secured by their property "is in default and due for the last 5 mortgage payment(s)." (Pl. Ex. 1.) The notice further advises Plaintiffs of how they can cure the default, and informs them that "failure to cure this default…may result in the acceleration of the sums secured by the Security Instrument, making the entire loan immediately due and payable." (*Id.*) This notice is in compliance with the notice of default requirements described in Section 51.002(d) of the Texas Property Code.

### (b)  Notice of Intent to Accelerate

The Deed of Trust at issue in this case includes an option acceleration clause, and states, "If lender exercises the option to require immediate payment in full, Lender will

give me notice of acceleration." (Doc. No. 40 at 9.) In order to validly exercise an optional acceleration clause like the one contained in Plaintiffs' Deed of Trust, a lender must provide (1) a notice of intent to accelerate that gives the borrower an opportunity to cure; and (2) a notice of acceleration that confirms that the debt has been accelerated. *Ogden v. Gibraltar Sav. Assoc.*, 640 S.W.2d 232, 233-234 (Tex. 1982).

Though Plaintiffs' production of the "Notice of Intent to Foreclose" (the document purporting to provide both notice of default and notice of intent to accelerate) is sufficient to persuade the Court that Plaintiffs received that document, an examination of the document itself demonstrates that, though adequate to serve as notice of default, it is insufficient notice of intent to accelerate. In *Ogden*, the Texas Supreme Court considered whether a notice of intent to accelerate which stated that "failure to cure…*may* result in acceleration" was sufficient to put the plaintiff on notice of the defendant's intent to accelerate. 640 S.W.2d at 233 (emphasis added).  The court held that, because it used the word "may," the notice was insufficiently clear as to whether acceleration *would* result. *Id.* The Texas court of appeals has since extended *Ogden* to hold that even language indicating that the defendant "intends" to exercise its rights— though somewhat more positive than the notice in *Ogden* that the defendant "may" exercise its rights—is too vague to constitute notice of intent to accelerate. *Sarasota, Inc. v. Ballew*, 2001 WL 194031, at * 3 (Tex. App.—Austin Feb. 28, 2001, pet. denied).

Here, the language in the "Notice of Intent to Foreclose" is nearly identical to the language at issue in *Ogden.* The letter states, "Failure to cure this default on or before 6:00 p.m., Eastern Time, on October 07, 2010, may result in the acceleration of the sums secured by the Security Instrument, making the entire loan immediately due and

payable." (Pl. Ex. 1.) Like the notice in *Ogden*, this letter indicates only that failure to cure the default *may* result in acceleration. The letter fails to give clear and unequivocal notice that Defendant planned to exercise the option to accelerate, and it is therefore insufficient notice of intent to accelerate.

(c) <strong>Notices of Acceleration and Sale</strong>

The Texas Property Code requires a lender to provide notice of sale 21 days prior to a foreclosure sale. Tex. Prop. Code § 51.002(b). Defendant presented persuasive summary judgment evidence to indicate that Defendant sent notice of sale and notice of acceleration in the same envelope on October 15, 2010. First, Plaintiffs' repeated reference to "October 15, 2010" as the date on which Defendant sent notice of intent to accelerate persuades the Court that Plaintiffs received a document (although it was not actually notice of intent to accelerate) sent by Defendant on October 15, 2010. (*See, e.g.*, Pl. Compl. ¶ 7, which states that "[o]n October 15, 2010, the Defendant sent a notice letter of intent to accelerate to the Plaintiffs.")  The Court refuses to believe that Plaintiffs erred multiple times in stating that they received a document sent on October 15, when that is the precise date on which Defendant sent the notices of acceleration and sale.

Even more persuasive was the testimony of Roy Lovell, Associate Director of Imaging and Document Production at Barrett Daffin Frappier Turner & Engel ("Barrett Daffin"), the law firm that sent notices to Plaintiffs on behalf of Defendant. Mr. Lovell testified at length about the process Barrett Daffin utilizes to ensure that notices sent by the firm include all necessary pages. Lovell described this process as a multi-step procedure with multiple checks and balances. The first part of the process involves an attorney approving a final packet (in this case, the packet would include notice of

10

acceleration and notice of sale) to be sent to a recipient. (Tr. 78.) The second part of the process involves the use of optical mark recognition ("OMR") technology, which prints a sequencing of marks on the side of every document to be sent out by Barrett Daffin. (Tr. 79-80.) If any page is missing from a particular packet, the OMR marks will be out of sequence, and the electronic process will flag the document for manual inspection. (Tr. 80-81.) The third part of the process requires an individual to go through the packet to ensure that every page is included. (Tr. 81.) The OMR marks and Barrett Daffin's multi-step process ensure that all of the pages which must go in a particular envelope are, in fact, enclosed in that envelope.

Mr. Lovell also testified that Barrett Daffin always sends notices of acceleration with notices of sale, and that the two are always sent in one envelope by certified mail. (Tr. 77.) According to Mr. Lovell, and the corresponding evidence produced by Defendant, notice of acceleration and notice of sale were sent to Plaintiffs on October 15, 2010. Service of a notice of sale "is complete when the notice is deposited in the United States mail, postage prepaid and addressed to the debtor at the debtor's last known address." Tex. Prop. Code § 51.002(e). If Mr. Lovell's testimony were not enough, Defendant also produced a certified copy of the notice of acceleration with tracking information from the U.S. Postal Service which indicates that the mailing was delivered on October 23, 2010 at 9:16 a.m. (Def. Ex. E.) Defendant's evidence, coupled with Plaintiffs' affirmation that they received a notice letter from Defendant sent October 15, leaves no question as to whether Defendant sent notice of sale and acceleration to Plaintiffs.

Ultimately, while the evidence clearly establishes that Plaintiffs received notices of default, acceleration, and sale, it also establishes that they did not receive proper notice of intent to accelerate, as is required before a lender may exercise the optional acceleration clause in a deed of trust. *Ogden*, 640 S.W.2d at 233-34.

### ii.   Lack of Standing to Foreclose

With respect to standing, Plaintiffs argue that there is a gap in the chain of title between the holder identified on the Note and Deed of Trust (World Savings Bank) and Wells Fargo, and that Plaintiffs in fact never signed the Deed of Trust.

Plaintiffs first argument—that Wells Fargo has not come forward with evidence showing a valid transfer of lien from its predecessors (World Savings Bank and Wachovia)—is without merit. At the Court's request, Defendant has produced the Note to Plaintiffs, putting to rest any dispute over whether Wells Fargo is the owner and holder of the Note. No genuine issue of material fact remains on this issue.

Plaintiffs second argument—asserted for the first time at the evidentiary hearing—is that that they never signed a Deed of Trust, and that the Deed of Trust produced by Defendant and purporting to contain Plaintiffs' signatures is a forgery. According to Plaintiffs' counsel, "if you read some of the information on the Internet, this is what the banks do. They create these documents." (Tr. 60.) In support of Plaintiffs' new argument that their signatures are forged, Plaintiffs compared the signatures on the Deed of Trust to signatures on each of their drivers' licenses, apparently hoping that the Court would be convinced by the fact that the two sets of signatures are not identical. Both Plaintiffs' names are ordered differently on their licenses than on the Deed of Trust: Ms. Ayiba's license is signed "Queen Ayiba," whereas her signature on the Deed of Trust

reads "Ayiba Queendalyn Chinyere." Mr. Suleman's license is signed "Ilodigwe Nelson," whereas the purported signature on the Deed of Trust is signed "Suleman Nelson Ilodigwe."

The Court is unmoved by these differences. As to the ordering of Plaintiffs' names in the two sets of signatures, any relevance of this difference is minimized considerably by the fact that Plaintiffs' own Complaint lists their names in a third way, and is inconsistent with both their licenses and the Deed of Trust. (Ms. Ayiba's name is listed in the Complaint "Chinyere Q. Ayiba," and Mr. Suleman's name is listed as "Nelson Ilodigwe Suleman." Moreover, as the Court noted at the hearing, Mr. Suleman's signature on the Deed of Trust actually looks strikingly similar to his signature on his license. Ms. Ayiba's name on the Deed of Trust does not look like the name on her license; however, Ms. Ayiba's name on the Deed of Trust is not actually a signature, but rather a printed name, making the two documents irrelevant for the purpose of comparing signatures.

Beyond these facial flaws in Plaintiffs' "forgery" argument, the Court simply does not find plausible the notion that Plaintiffs entered into this agreement with the bank, and have lived in the home for the past thirteen years, without having ever signed a Deed of Trust. Even if Plaintiffs' argument were remotely tenable, the Court is convinced that Plaintiffs long ago waived the argument that they never signed a Deed of Trust. In Plaintiffs' own Complaint, they assert claims for breach of contract based in part upon Defendant's breach of terms contained in the Deed of Trust. Plaintiffs' Complaint states, "There is a valid contract. The note and the deed of trust signed by the parties to the Promissory Note and Deed of Trust contained the agreement and the duties of the

parties." (Pl. Compl. ¶ 19.) This claim affirmatively asserts that Plaintiffs were a party to the Deed of Trust. They cannot argue now that they never signed a Deed of Trust.

### b. Grossly Inadequate Selling Price

In its notice of removal, Defendant informed the Court that the Harris County Appraisal District appraised Plaintiffs' property at $99,571. (Doc. No. 1 at 3.) Defendant sold the property for $49,985.22. (Pl. Compl. ¶ 20.) Because it appears that Defendant sold the property well below its value, there remains a genuine issue of material fact on this element of the claim.

### c. Causal Connection Between Defect and Grossly Inadequate Selling Price

As Plaintiffs point out, had the Defendant not defectively foreclosed on Plaintiff's property, the property would not have been sold at all. Rather, according to Plaintiffs, they would have paid the amount due and the home would not have been foreclosed upon. The Court finds that there is a sufficient causal connection between the defect in notice and the grossly inadequate selling price such that summary judgment should not be granted on Plaintiffs' wrongful foreclosure claim based upon absence of any of the required elements of the claim.

### 2. Breach of Contract

Plaintiffs allege that Wells Fargo breached its contract with Plaintiffs by (1) failing to provide notices required under their Deed of Trust; and (2) failing to accept payment from Mr. Suleman.[6]

---

[6] In their Complaint, Plaintiffs state that Defendant breached "a valid contract," and that "the note and deed of trust signed by the parties contained the agreement and duties of the parties." (Pl. Compl. ¶ 6.2.) Because the Court finds that Plaintiffs waived their in-court allegations that they never signed a Deed of Trust, the Court does not consider the impact that these arguments might have on Plaintiffs' breach of contract claims.

### a.  Failure to Provide Notice

Plaintiffs allege that Wells Fargo did not provide sufficient notice prior to foreclosing on their home. A lender's failure to provide the notices required by a Deed of Trust can constitute a breach of contract. *See, e.g.*, *Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 140 (Tex. App.—Corpus Christi 2008, no pet.). To the extent that Plaintiffs' breach of contract claim is premised upon Defendant's alleged failure to provide notices of default and sale, the claim must fail, as neither of these forms of notice is required by the contract itself. However, as discussed above, the Deed of Trust at issue in this case explicitly requires notice of acceleration. And, as *Ogden* makes clear, "notice of acceleration" requires both notice of intent to accelerate and a subsequent notice of acceleration. Because the Deed of Trust expressly provides for notice of acceleration, and because the notice of acceleration in this case is invalidated by the ambiguous language in the notice of intent to accelerate, a genuine issue of material fact remains on this portion of Plaintiffs' breach of contract claim.

### b.  Failure to Accept Payment

Plaintiffs also allege that Defendant breached the contract by rejecting Plaintiffs' attempts to make their mortgage payments. In their Complaint, Plaintiffs allege that Mr. Suleman made two efforts to make the necessary payments, but that Wells Fargo refused to accept his offer, insisting that all payments had to be made by Ms. Ayiba. Plaintiffs then allege that, on November 25, 2010, Ms. Ayiba returned from vacation and offered to pay the reinstatement in the amount of $5,000. As discussed above, Plaintiffs' in-court testimony regarding these allegations conflicted with their Complaint. The Court is unconvinced by either of Plaintiffs' stories, and finds that the plethora of inconsistencies

renders them uncredible witnesses. As this claim is based entirely upon Plaintiffs'

unsubstantiated allegations, the Court concludes that no genuine issue of material fact

remains on this claim.

### 3.   Violations of the TDCA

Under the TDCA, a consumer may sue a debt collector attempting to collect a

debt for "threats, coercion, harassment, abuse, unconscionable collection methods, or

misrepresentations made in connection with the collection of a debt." *T & S Auto Sales*

*Inc. v. Anderson*, 2000 WL 140935, at *1 n. 2 (Tex. App.—Austin Feb. 3, 2000, no pet.)

(citing Tex. Fin. Code §§ 392.301-392.404). A violation of the TDCA is also actionable

under the Deceptive Trade Practices Act, which allows a civil action for false,

misleading, or deceptive acts taken in the conduct of trade or commerce. *Id.* at nn. 1 & 2

(citing Tex. Fin. Code § 392.404; Tex. Bus. & Com. Code §§ 17.41-17.63).

Plaintiffs argue that Wells Fargo violated the TDCA by failing to disclose clearly

in its communication with Plaintiffs, when making a demand for money, the name of the

entity to whom the debt had been assigned or was owed. Tex. Fin. Code § 392.304(a)(4).

Plaintiffs fail to provide any factual basis for this contention, and have provided no

evidence to support it. As a result, no genuine issue of material fact remains on Plaintiffs'

TDCA claim.

### 4.   Violations of the UCC

Plaintiffs assert that Defendant violated Article 3 § 3-309 of the UCC. This claim

is based entirely upon Plaintiffs' argument that, until Defendant provided Plaintiffs with

the original Note, it had no standing to foreclose. As Defendant has since provided the

original Note, there remains no genuine issue of material fact on this claim, and summary judgment must be granted in favor of Defendant.

### 5.   Suit to Quiet Title

A suit to quiet title is an equitable action in which the plaintiff seeks to recover property wrongfully withheld. *See Porretto v. Patterson*, 251 S.W.3d 701, 708 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Fricks v. Hancock*, 45 S.W.3d 322, 327 (Tex. App.—Corpus Christi 2001, no pet.). To establish a claim for suit to quiet title, Plaintiffs must show the following: (1) an interest in specific property; (2) that title to the property is affected by a claim by Defendant; and (3) that Defendant's claim, although facially valid, is invalid or unenforceable. *Sadler v. Duvall*, 815 S.W.2d 285, 293 n. 2 (Tex. App.—Texarkana 1991, pet. denied). In order to constitute a cloud on the title removable by the Court, a defendant's adverse claim must be one that is valid on its face but is proved by extrinsic evidence to be invalid or unenforceable. *Id.*; *Best Inv. Co. v. Parkhill*, 429 S.W.2d 531, 534 (Tex. App.—Corpus Christi 1968, writ dism'd w.o.j.). Because the evidence in the case raises concerns as to whether Defendant followed proper procedures in foreclosing on Plaintiffs' property, and thus whether Defendant's claim to title is valid, the Court finds that a genuine issue of material fact remains on this claim.

### 6.   Declaratory Judgment

Plaintiffs seek a declaratory judgment on the following nine facts: (1) that Defendant "does not have standing to collect payments on Plaintiffs' mortgage;" (2) that Defendant "is not the holder of the original Note and Deed of Trust;" (3) that "if the Note is separated from the Deed of Trust, Defendant only has an unsecured debt which cannot attach to Plaintiffs' property for foreclosure purposes because Plaintiffs' home is their

homestead and protected from forced sale;" (4) that Defendant "did not possess the legal standing to foreclose on Plaintiffs' home;" (5) that if Defendant "fails to produce the original promissory Note it claims was secured by the Deed of Trust, Defendant is without legal authority to foreclose the subject property;" (6) that "Plaintiffs have clear and clean title to the subject property;" (7) that Defendant "has neither financial nor equitable interests in the property;" (8) that "Plaintiffs have free and clear title to the subject property;" and (9) that Defendant "did not comply with the notice provisions of the Deed of Trust." (Pl. Compl. ¶ 29.)

The Court denies the first five requests; Defendant has produced the original Note, resolving all challenges raised in these requests.  As to the sixth, seventh, eighth, and ninth requests, the Court reserves judgment. For the reasons discussed above, genuine issues of material fact remain on these claims.

## III.    PREEMPTION

Defendant argues that Plaintiffs' remaining wrongful foreclosure and breach of contract claims must fail because they are preempted by the Home Owners Loan Act of 1933 (HOLA), 12 U.S.C. §§ 1461-1470.[7] HOLA, "a product of the Great Depression of the 1930's, was intended 'to provide emergency relief with respect to home mortgage indebtedness' at a time when as many as half of all home loans in the country were in default." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159 (1982) (quoting H.R. Conf. Rep. No. 210, 73d Cong., 1st Sess., 1 (1933)); *see also In Re: Ocwen*

---

[7] Although Defendant Wells Fargo is not a Federal savings association, and is therefore not itself protected by HOLA, this action is governed by HOLA because Plaintiff's loan originated with a federal savings bank, and was therefore subject to the requirements set forth in HOLA. *See Appling*, 745 F. Supp. 2d 961, 971 (N.D. Cal. 2010) (finding that, because Plaintiff's loan originated with an entity protected by HOLA, HOLA applied even when the loan was later taken over by Wells Fargo, to which HOLA would not otherwise apply).

*Loan Servicing, LLC Mortgage Servicing Litigation*, 491 F.3d 638, 642 (7th Cir. 2007).

Pursuant to HOLA, the Treasury Department's Office of Thrift Supervision (OTS) is

empowered "to authorize the creation of federal savings and loan associations, to regulate

them, and by its regulations to preempt conflicting state law." *Ocwen*, 491 F.3d at 642.

Under HOLA, OTS has "authority [that] is preemptive of any state law purporting to

address the subject of the operations of a Federal savings association." 12 C.F.R. § 545.2.

With this authority, the OTS issued a regulation which allows federal savings and loan

associations to "extend credit as authorized under federal law . . . without regard to state

laws purporting to regulate or otherwise affect their credit activities." 12 C.F.R. §

560.2(a).

Subsection 560.2(a) of the OTS regulation makes clear that OTS "occupies the

entire field of lending regulation for federal savings associations," leaving no room for

conflicting state laws. *Id.* Subsection 560.2(b) goes on to provide a non-exhaustive list of

examples of state laws which are expressly preempted, stating, in relevant part, "Except

as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a)

of this section include, without limitation, state laws purporting to impose requirements

regarding," *inter alia*, "[p]rocessing, origination, servicing, sale or purchase of, or

investment or participation in, mortgages." 12 U.S.C. § 562(b)(10). Subsection 560.2(c)

then provides:

> State laws of the following types are not preempted to the extent that they
> only incidentally affect the lending operations of Federal savings
> associations or are otherwise consistent with the purposes of paragraph (a)
> of this section:
>
>> (1) Contract and commercial law;
>> (2) Real property law;
>> (3) Homestead laws specified in 12 U.S.C. 1462a(f);

(4) Tort law;
(5) Criminal law; and
(6) Any other law that OTS, upon review, finds:
    (i) Furthers a vital state interest; and
    (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

12 C.F.R. § 560.2(c). As the Fifth Circuit has not yet considered HOLA preemption in this context, the Court takes guidance from the statute and regulations themselves as well as from other federal courts that have ruled on the issue. The Court also notes that Plaintiffs have not contended that OTS exceeded its statutory authority or acted arbitrarily, so Court does not consider that question. *Cf. Flagg v. Yonkers Sav. And Loan Ass'n, FA*, 396 F.3d 178, 182083 (2d Cir. 2005) (finding that the OTS' exercise of preemption is within HOLA's grant of authority and is not arbitrary).

OTS has instructed that, when applying Section 560.2, a court should first decide whether the state law in question is listed in subsection 560.2(b). 61 Fed. Reg. 50951, 50966-50967 (Sept. 30, 1996). If it is, the analysis ends and the law is preempted. *Id.*; *see also Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1005 (9th Cir. 2008). If the law at issue is not covered by subsection (b), the next question is whether the law affects lending. If it does, then, in accordance with subsection (a), a presumption arises that the law is preempted. *Id.* This presumption can be reversed only if the law can clearly be shown to fit within the confines of subsection (c). *Id.* For these purposes, subsection (c) is intended to be interpreted narrowly, and any doubt should be resolved in favor of preemption. *Id.*

As the Seventh Circuit explains in *Ocwen*, "[t]he line between subsections (b) and (c) is both intuitive and reasonably clear." 491 F.3d at 643. OTS "has exclusive authority

20

to regulate the savings and loan industry in the sense of fixing fees (including penalties),

setting licensing requirements, prescribing certain terms in mortgages, establishing

requirements for disclosure of credit information to customers, and setting standards for

processing and servicing mortgages." *Id.* (citing 12 U.S.C. §§ 1462, 1463, 1464; 12

C.F.R. §§ 500.2, 500.10; 61 Fed. Reg. at 50965). But while it has some prosecutorial and

adjudicatory powers, 12 U.S.C. § 1464(d); 12 C.F.R. § 509.1; *Simpson v. Office of Thrift*

*Supervision*, 29 F.3d 1418, 1422 (9th Cir. 1994), OTS does not have the authority to

provide a remedy to those injured by federal savings and loan associations' wrongful

acts. *Ocwen*, 491 F.3d at 643 (citing *Burns Int'l Inc. v. Western Savings & Loan Ass'n*,

978 F.2d 533, 535-37 (9th Cir. 1992)). Thus, neither federal law nor OTS has the means

to provide redress to Plaintiffs harmed by federal savings and loan associations' breaches

of contract, fraud, or other tortious acts. In light of OTS' limited remedial authority,

Section 560.2 cannot be read to "deprive persons harmed by the wrongful acts of savings

and loan associations of their basic state common-law-type remedies." *Id.* at 643.

Plaintiffs' breach of contract claim is the sort of common law claim that Section

560.2(c) is meant to preserve. In asserting this claim, Plaintiffs do not ask Defendant to

follow any particular state law in drafting contract terms or setting contractual conditions.

Plaintiffs do not challenge the legality of the terms in their contract. Rather, Plaintiffs

only seek to enforce their contract as it is written, and to require Defendant to provide the

notice that it was contractually obligated to provide. For these reasons, the Court finds, as

many other courts have found, that Plaintiffs' common law breach of contract claims are

not preempted by HOLA.  *See, e.g.*, *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d

1073, 1086 (C.D. Cal. 2009) (holding that breach of contract claim was not preempted

and explaining that, because it would "have at most an incidental effect on the exercise of [the defendant's] lending powers . . . . [s]uch a claim does not seek to force [the defendant] to set its contracts in a certain way, but rather merely to adhere to the contracts it does create"); *Reyes v. Downey Savings and Loan Ass'n, F.A.*, 541 F. Supp. 2d 1108, 1114 (C.D. Cal. 2008) ("[A] law against breach of contract will not be preempted just because the contract relates to loan activity."); *McAnaney v. Astoria Financial Corp.*, 665 F. Supp. 2d 132, 164 (E.D.N.Y. 2009) ("The breach of contract claim . . . does not seek to impose specific substantive requirements upon the operations of defendants, apart from compliance with specific contractual obligations."); *Baldanzi v. WFC Holdings Corp.*, 2008 WL 4924987, at *3 (S.D.N.Y. Nov. 14, 2008) (finding breach of contract claim not preempted by HOLA where claim only sought to "enforce the terms of contracts into which Defendant entered"); *Mincey v. World Savings Bank, FSB*, 614 F. Supp. 2d 610, 646 (D.S.C. 2008) (holding breach of contract claim not preempted); *Harris v. Wachovia Mortg., FSB*, 185 Cal. App. 4th 1018, 1026 (Cal. Ct. App. 2010) (because breach of contract claim was a matter of ordinary contract law and had no effect on savings association's lending activities, the claim was not preempted). Indeed, if states could not provide protection to consumers for breaches of lending contracts, then federal savings and loan associations effectively could "use preemption as a shield to avoid adherence" to the commitments they make to their customers. *McAnaney*, at 164 n.36 (E.D.N.Y. 2009).

While Plaintiffs' wrongful foreclosure claim is also a common law claim, it must undergo a different analysis. The wrongful foreclosure claim is based upon Defendant's failure to comply with notice requirements set out in § 51.002 of the Texas Property

Code, as interpreted by the Texas Supreme Court in *Ogden*, 640 S.W.2d 232. The particular claim at issue in this case seeks to bind federal savings and loan associations to specific notice requirements set out under state law. A number of California courts have considered wrongful foreclosure cases claiming violations of § 2923.5 of the California Civil Code (the California statute laying out California's notice requirements for non-judicial foreclosures). All federal courts to have considered such claims have found that they are preempted by HOLA. *See, e.g.*, *DeLeon v. Wells Fargo Bank, N.A.*, 729 F. Supp. 2d 1119 (N.D. Cal. 2010); *Biggins v. Wells Fargo & Co.*, 266 F.R.D. 399 (N.D. Cal. 2009) (finding that the plaintiff's claims of misconduct surrounding the foreclosure proceedings fell under the preemption provisions for "processing, origination, sale or purchase of . . . mortgages" and "disclosure"); *Murillo v. Aurora Loan Servs., LLC*, 2009 WL 2160579, at * 4 (N.D. Cal. July 17, 2009) (claims based upon the defendant's failure to properly file a declaration with their notice of default concerned the processing and servicing of plaintiffs' mortgage, and, as such, the claims were preempted under HOLA). The Court agrees with the great weight of authority in this area, and finds that the wrongful foreclosure claim alleged in this case relates to state law requirements dealing with the processing and servicing of mortgages. Such a claim is preempted by HOLA pursuant to Subsection 560.2(b).[8]

### IV.    PRELIMINARY INJUNCTION

---

[8] The Court limits its holding to the particular facts of this case, and does not hold that all claims against federal savings and loan associations based upon violations of state statutes are preempted by HOLA. In fact, the Court recognizes that HOLA's preemptive effect might be different were Plaintiffs' claims based upon state statutes prohibiting deceit or failure to act in good faith. Such common law principles are distinguishable from the specific notice requirements at issue in this case, and the Court does not opine on whether or not such claims would be preempted.

As a remedy for Plaintiffs' one remaining claim for breach of contract, Plaintiffs seek a preliminary injunction enjoining the foreclosure and preventing Defendant from selling their property to a third party.

### A. Legal Standard

"A preliminary injunction requires that 'the applicant ... show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)). Although the grant or denial of a preliminary injunction rests in the discretion of the trial court, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940), the Fifth Circuit has cautioned that "a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Lake Charles Diesel*, 328 F.3d at 196 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 2003)).

### B. Analysis

Generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available. *Canteen Corp. v. Republic of Texas Props., Inc.*, 773 S.W.2d at 398, 401 (Tex. App.—Dallas 1989, no writ); *Chevron U.S.A., Inc. v. Stoker*, 666 S.W.2d 379, 382 (Tex. App.—Eastland 1984, writ dism'd). However, if the

preliminary injunction elements are met, a preliminary injunction may be appropriate in contract disputes involving real property. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

### 1.   Likelihood of Success on the Merits

As discussed above, the Court has concluded that Defendant's notice of intent to accelerate, which was required under the contract, was insufficient. Texas recognizes specific performance as a remedy for a breach of contract. *See, e.g.*, *Blue Moon Venture, L.L.C. v. Horvitz*, 2010 WL 4013533, at *1 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (mem. op.) ("The equitable remedy of specific performance may be awarded upon a showing of breach of contract." (citing *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied)). If Plaintiffs succeed on their breach of contract claim, Defendant will be required to provide proper notice of intent to accelerate prior to acceleration. The Court finds that Plaintiffs are likely to succeed on their breach of contract claim.

### 2.   Irreparable Injury

An injury is irreparable if the party seeking the injunction cannot be adequately compensated by monetary damages, or if those damages are incapable of calculation— that is, if there is no adequate remedy at law. *North Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Reach Grp., L.L.C. v. Angelica Grp.*, 173 S.W.3d 834, 838 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Plaintiffs have indicated that they will be irreparably harmed both by the loss of their property, and by the resulting damage to their credit ratings. (Doc. No. 24, at 5.)

In considering the availability of an adequate remedy at law, Texas courts have held that every piece of real estate is unique, *Greater Houston Bank v. Conte*, 641 S.W.2d 407, 410 (Tex. App.—Houston [14th Dist.] 1982, no writ), and that the existence of a cause of action for damages is no basis for denying equitable relief. *El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883 (Tex. App.—Corpus Christi 1987, no writ); *Guardian Sav. & Loan Ass'n v. Williams*, 731 S.W.2d 107, 109 (Tex. App.—Houston [1st Dist.] 1987, no writ); *Irving Bank & Trust Co. v. Second Land Corp.*, 544 S.W.2d 684, 688 (Tex. Civ. App.—Dallas, 1976, writ ref'd n.r.e.). Moreover, a threat to one's credit rating, one of the harms claimed by Plaintiffs, can be considered irreparable. *Home Sav. of Am., F.A. v. Van Cleave Dev. Co., Inc.*, 737 S.W.2d 58, 59 (Tex. App.—San Antonio 1987, no writ). The Court is convinced that the loss of Plaintiffs' property would be an irreparable injury for which Plaintiffs could not be adequately compensated in damages.

### 3.   Balance of Hardships

While the Court recognizes that enjoining the foreclosure would have a deleterious effect on Defendant, who would have to delay sale of the property in an uncertain economy, the Court thinks it clear that the hardship imposed Plaintiffs—who are at risk of losing their home and $30,000 of equity in their property—is greater.

### 4.   Effect on the Public Interest

Foreclosure in this case would adversely affect the public interest. It would not only render Plaintiffs and their three children homeless, but it would validate Defendant's foreclosure upon a home after employing inadequate notice procedures. An injunction preventing Wells Fargo from selling the property to a third-party would serve the public interest, because it would prevent banks such as Defendant from insulating themselves

from equitable remedies in wrongful foreclosure cases by transferring title to a third-party, which the Court cannot set aside.

For the reasons discussed above, the Court finds that a preliminary injunction preventing Wells Fargo from selling Plaintiffs' home to a third party is appropriate. However, because the Court did not ask the parties specifically to address preliminary injunction arguments at the evidentiary hearing, the Court will give Defendant ten (10) days to file supplementary briefing on any arguments that it believes the Court did not consider in this Memorandum and Order. If the Court is persuaded by such briefing, further proceedings or written submissions may be necessary. If the Court receives no such briefing, or if the briefing fails to raise new arguments not already considered, the Court will enter a preliminary injunction at that time.

### V.        CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Wells Fargo's Motion for Summary Judgment. The Court also indicates its intent to **GRANT** Plaintiffs' request for a preliminary injunction. Specifically:

- The Court grants summary judgment for Wells Fargo on Plaintiffs' TDCA, UCC, and wrongful foreclosure claims;

- The Court denies summary judgment on Plaintiffs' suit to quiet title and breach of contract claims;

- The Court denies the first five of Plaintiffs' nine declaratory judgment requests and reserves judgment on the remaining four; and

- The Court notifies the parties of its intent to grant a preliminary injunction on Plaintiffs' breach of contract claim. This injunction would prevent Wells Fargo from

27

selling Plaintiffs' home to a third party. The Court will enter a preliminary injunction in ten (10) days, unless the Court receives briefing from Defendant which persuades the Court that a preliminary injunction is not appropriate.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 5th day of December, 2011.

_____
THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE